**Electronically Filed
Intermediate Court of Appeals
29732
27-OCT-2010
10:01 AM**

NO. 29732

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI, Plaintiff-Appellee, v.
FRANK SANES, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 05-1-2537)


MEMORANDUM OPINION
(By:  Nakamura, Chief Judge, Foley and Leonard, JJ.)

This is a homicide case arising out of an incident that occurred on the morning of December 1, 2005, at Star Karaoke in the Waimalu Shopping Center, where the decedent, Bill Refilong (**Refilong**), suffered two knife wounds, one of which was fatal. Defendant-Appellant Frank Sanes (**Sanes**) was indicted on December 6, 2005 for second degree murder pursuant to Hawaii Revised Statutes (**HRS**) §§ 707-701.5 (1993) and 706-656 (1996).  Following a jury trial, Sanes was found guilty of manslaughter pursuant to HRS § 707-702 (2003) and sentenced to 20 years of incarceration. Sanes appeals from the Circuit Court of the First Circuit's (**Circuit Court**) March 2, 2009 Judgment of Conviction and Sentence.[1]

---

[1]    The Honorable Richard K. Perkins presided.

1

I.    BACKGROUND

At trial, Sanes admitted that he caused the knife wound responsible for Refilong's death, but claims that he was acting in self-defense.  Testimony relevant to this appeal includes the following:

A.    Mary Flynn's Testimony

Forensic pathologist Mary Flynn performed Refilong's autopsy and testified that Refilong bled to death as a result of a stab wound to the neck.  Flynn also observed a similar stab wound to Refilong's back.  Refilong's blood contained .263 grams of alcohol per 100 milliliters of blood and tested negative for cocaine, opiates, PCP, methamphetamine, and amphetamine.

B.    Efraim Paulis's Testimony

Efraim Paulis (**Paulis**) was Refilong's cousin and testified with the assistance of an interpreter.  Paulis testified that upon arriving at Star Karaoke, he noticed an acquaintance named Emmanuel Esteras (**Esteras**) sitting at a table with four other men.  Refilong then approached Esteras's table and began talking to someone at that table.  Paulis did not notice any arguments arising out of that particular conversation. Paulis followed Refilong and the men Refilong spoke to outside of Star Karaoke.  Paulis then spoke to an unidentified person and asked them what caused Refilong to appear to be "angry and confused," although Paulis's interpreter immediately asked that the word "angry" be stricken.  Sanes raises issues related to the interpreter's error in this appeal.

Paulis further testified that, approximately five minutes later, Paulis was met by his other cousin, Blackie Otto (**Otto**), outside of the bar.  Soon after, a car containing two men parked near the entrance of the bar.  The driver then threatened to stab Refilong if he saw him at a bus stop.  Both the driver and the passenger then proceeded to exit the car; the driver with a sword, and the passenger, who was identified as Sanes, with a

twelve to fifteen inch sheathed knife.  Paulis testified that the
driver appeared angry and Sanes appeared drunk.  According to
Paulis, none of the men, except for the driver and Sanes, had
weapons that night, nor did he have any weapons or threaten the
driver or Sanes.

When Sanes got out of the car, Paulis testified that
Sanes "ran out and he stabbed [Refilong]."  Paulis only witnessed
Sanes stab Refilong once to the right side of his neck from the
back with a downward blow.  After Sanes stabbed Refilong,
Refilong fell to the cement, and the driver and Sanes returned to
the car and drove away.

C.    Emmanuel Esteras's Testimony

Esteras testified that he was at Star Karaoke when
Refilong walked into the bar with Paulis, and that he did not
observe any arguments while inside, although he did leave to use
the restroom before Refilong spoke to Sanes or his group.  While
Esteras was in the restroom, the men went outside and Esteras
later followed.  Once outside, Esteras witnessed Sanes and
Refilong arguing, while Esteras's cousin Alex Terno aka Tainy
Estes (**Tainy**) and Refilong and Paulis were also arguing with each
other.

Upon exiting the bar, Esteras noticed a car parked
outside of Star Karaoke and identified Tainy as the driver and
Sanes as the passenger.  At this time, Paulis was arguing with
Sanes and wanted to fight him, while Refilong argued with Tainy
and told him to buy more beer for his group.  Esteras testified
that he did not witness Sanes cut Refilong in the back, although
he did witness Sanes stab Refilong in the neck.  Esteras did not
witness Refilong chase Sanes after being stabbed, and instead,
testified that Refilong fell into the parking lot after the fatal
blow, with Sanes and Tainy entering the car and leaving
thereafter.

D.    John Lean's Testimony

John Lean (**Lean**) had a lengthy criminal record.  As discussed below, at some point, Lean entered into a cooperation agreement with prosecutors, pursuant to which Lean would testify in two unrelated murder cases.

Lean testified that he met Sanes at the Oahu Community Correctional Center (**OCCC**), where Lean was being held in the "hole" because he was a "management problem."  Lean said that he met Sanes in the hole in December of 2005, at which time Sanes admitted to Lean that he had "cut somebody with a sword" at the Waimalu Shopping Center.  Sanes explained to Lean that he killed Refilong because Refilong was "eyeballing" him.  Sanes further stated that he killed Refilong because Sanes admired his uncle, who was incarcerated for murder, and wanted to be like him.  Lean reported that Sanes smiled and appeared to think that the murder was funny when he made his admission to Lean.

Upon cross-examination, it was revealed that Lean's lawyer was negotiating the cooperation agreement "sometime in December also, maybe November" of 2005.  The letter from the prosecutors was received on December 28, 2005 and signed in April of 2006.

E.    Frank Sanes's Testimony

Sanes testified that, on the night of the incident, he and Tainy stopped at Waimalu Shopping Center after spotting Esteras and his coworker, Jerry Timothy.  Esteras and his coworker invited Sanes and Tainy into Star Karaoke and offered to buy them beer.  Sanes said that he had never been into Star Karaoke before and did not enter looking for trouble.  Sanes stated that Refilong and Paulis entered the bar a short time before the 2:00 a.m. closing time, at which point Refilong approached Sanes's table and asked Sanes's group to buy Refilong and Paulis beer.  Sanes then told his group that they should

leave because Refilong looked drunk and Sanes was worried that Refilong would "make trouble."

Sanes and Tainy left the bar and went out to their car, while Refilong and Paulis followed them outside and continued demanding that Sanes and Tainy buy them beer.  Paulis then said that if Sanes and Tainy did not exit their car, he and Refilong would cut them and break their car.  Sanes stated that he subsequently exited the car to get Tainy so that they could leave, and while exiting the car, found a knife in the pocket area of the passenger seat.  Paulis had a knife, which he pulled out from the sheath while walking towards Sanes and Tainy.  Sanes then heard Tainy say "cut," at which point Sanes threw his knife back because he was scared he was going to be hurt.  This swing hit Refilong, although Sanes did not identify who had been hit until after the blow.  Sanes heard Tainy's car moving and was afraid that he was being left behind.  While running to the car, Sanes felt someone grab his shoulder and say he was going to kill Sanes, which caused Sanes to react by swinging his knife backwards over his shoulder, delivering the second and fatal blow to the right side of Refilong's neck.  Sanes entered the car and left the scene because he did not want to get hurt.  Sanes testified that he did not see Refilong with a weapon, although he did see Refilong with his hands in his pockets, which led Sanes to believe that Refilong was hiding something.

F.    Ronald Takasato's Testimony

Ronald Takasato was the lead detective for Refilong's homicide.  During Detective Takasato's testimony, Sanes's counsel attempted to introduce a newspaper clipping found in Refilong's wallet, which described six men involved in a previous stabbing at the same shopping center.  The prosecutor objected to its introduction based on a lack of relevance and hearsay grounds.  After a bench conference, the objection was sustained pursuant to Hawaii Rules of Evidence (**HRE**) Rules 401 and 403.

II.   POINTS OF ERROR

Sanes raises the following points of error on appeal:

(1)   The Circuit Court erred when it found that Lean was not acting as an agent for the State when Sanes made his admissions to Lean;

(2)   Sanes was denied due process and a fair trial as the result of an inaccurate interpretation of the testimony of Paulis;

(3)   The Circuit Court erred by precluding evidence of a newspaper clipping found in Refilong's wallet;

(4)   Sanes received ineffective assistance of counsel when his trial counsel failed to move to suppress Lean's statements and to fully prepare Sanes for his testimony;

(5)   The Circuit Court erred by failing to give a cautionary instruction concerning Lean's lack of credibility; and

(6)   Sanes was deprived of a fair trial as a result of prosecutorial misconduct related to the State's alleged depiction of Sanes as a "management problem" housed in the "hole."

III. STANDARDS OF REVIEW

Findings of facts, including the Circuit Court's finding that Lean was not acting as an agent of the State when Sanes spoke to Lean, are reviewed under the clearly erroneous standard. Dan v. State, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." State v. Keliiheleua, 105 Hawai'i 174, 178, 95 P.3d 605, 609 (2004) (citations omitted).

The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. State v. Plichta, 116 Hawai'i 200,

6

214, 172 P.3d 512, 526 (2007); State v. Loa, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272 (1996). Therefore, the Circuit Court's denial of Sanes's motion for a mistrial based on purported errors in the translation of Paulis's testimony is reviewed for an abuse of discretion.

A trial court's determination that evidence is relevant is reviewed under the right/wrong standard of review. State v. St. Clair, 101 Hawai'i 280, 286, 67 P.3d 779, 785 (2003). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." HRE Rule 403. Whether relevant evidence is admissible under Rule 403 is a determination well-suited to a trial court's exercise of discretion because it requires a "cost-benefit calculus" and a "delicate balance between probative value and prejudicial effect." Kaeo v. Davis, 68 Haw. 447, 454, 719 P.2d 387, 392 (1986). Hawai'i's appellate courts review such a determination for an abuse of discretion. Id.; see State v. Cordeiro, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002).

In claims of ineffective assistance of counsel, the defendant has the burden of proving: (1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and (2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense. State v. Wakisaka, 102 Hawai'i 504, 513-14, 78 P.3d 317, 326-27 (2003). "[M]atters presumably within the judgment of counsel, like trial strategy, will rarely be second-guessed by judicial hindsight." State v. Richie, 88 Hawai'i 19, 39, 960 P.2d 1227, 1247 (1998) (internal quotation marks and citation omitted; emphasis in original).

The standard of review for jury instructions that were not objected to at trial was clarified in State v. Nichols, 111 Hawai'i 327, 141 P.3d 974 (2006), where the Hawai'i Supreme Court held that

> although as a general matter forfeited assignments of error are to be reviewed under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt.

Id. at 337, 141 P.3d at 984 (footnote omitted). Thus, the appellant must first demonstrate instructional error by rebutting the "presumption that unobjected-to jury instructions are correct." Id. at 337 n.6, 141 P.3d at 984 n.6; accord State v. Eberly, 107 Hawai'i 239, 250, 112 P.3d 725, 736 (2005). If the appellant is able to rebut this presumption, the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt. Nichols, 111 Hawai'i at 334, 141 P.3d at 981.

Sanes's claim of prosecutorial misconduct is raised for the first time on appeal. Therefore, we determine whether the statements were improper and, if so, whether they constituted plain error that affected Sanes's substantial rights. HRPP 52(b) and State v. Suan 121 Hawai'i 169, 174, 214 P.3d 1159, 1164 (App. 2009).

IV. DISCUSSION

A. Lean as an Agent of the State

Sanes argues that Lean was an agent of the State because at the time of Sanes's statements to Lean, Lean was negotiating a plea agreement to testify in two unrelated homicide cases.

This issue has not been squarely discussed in Hawai'i. There have been, however, cases elsewhere in which an inmate has

made incriminating statements to another inmate, thus raising the issue of whether the second inmate is an agent of the state. In United States v. Stevens, 83 F.3d 60 (2d Cir. 1996), it was held that inmate-informants who proffered incriminating statements by the defendant to the government were not agents of the State until they (1) reached an actual agreement with the government; and (2) subsequently obtained further information at the direction of the government. 83 F.3d at 64-65. As another federal circuit court explained, "[a]n inmate who voluntarily furnishes information without instruction from the government is not a government agent[.]" United States v. Brink, 39 F.3d 419, 423 (3d Cir. 1994) (citing United States v. Van Scoy, 654 F.2d 257, 260 (3d Cir. 1981)). Similarly, in United States v. Watson, 894 F.2d 1345 (D.C. Cir. 1990), it was explicitly held that government involvement is not implicated when an inmate-informant gains incriminating information with the aim of exchanging such information in the future without an agreement with, or direction from, the government. 894 F.2d at 1348 (citing United States v. Hicks, 798 F.2d 446, 448-49 (11th Cir. 1986)); see also, Stevens, 83 F.3d at 64.

We find the reasoning in these cases to be persuasive. Accordingly, we conclude that the Circuit Court did not err when it found that Lean was not an agent of the State when Sanes made his incriminating statements. Although Lean was negotiating to testify in two other homicide trials, nothing in the record suggests that he actually had an agreement to assist in the investigation of any homicides at the time of Sanes's statements, nor is there any evidence that Lean was acting pursuant to instructions from the government when he spoke to Sanes at OCCC.

B.    Sanes's Motion for a Mistrial

Sanes argues that his motion for a mistrial was erroneously denied because the Chuukese interpreter, Betty Irons (**Irons**), spoke a different dialect than Paulis, was not a

certified court interpreter, and had difficulty understanding and interpreting Paulis's testimony. In support of his argument, Sanes cites the portion of the November 10, 2008 transcript in which Irons asks the court to strike the word "anger" from Paulis's testimony. Sanes also highlights three instances in which Irons needed to "catch up," two instances in which she had to rephrase her translation, and another instance where she sought the help of another interpreter to understand a word.

The constitutional guarantee of due process does not guarantee a perfect trial. State v. Casipe, 5 Haw. App. 210, 216, 686 P.2d 28, 34 (1984). Thus, when the proficiency of an interpreter is challenged, a court must determine whether "the testimony as presented through the interpreter [was] understandable, comprehensible, and intelligible, and if not, whether such deficiency resulted in the denial of the defendant's constitutional rights[.]" Id. at 214, 686 P.2d at 32 (citations omitted). Moreover, "[t]here is a rebuttable presumption that an interpreter in the course of performing his official duty has acted regularly[,]" and that "[a]lthough an interpreter may have encountered some difficulties translating the testimony, those difficulties, without more, are not sufficient to rebut the presumption." Id.

Sanes submits that Irons was not certified as a qualified court interpreter and that she spoke a different dialect than Paulis. Although it would have been ideal to use a certified reporter who spoke the same dialect as Paulis, these facts do not constitute per se reversible error by the Circuit Court. This court has held that a defendant is not denied due process where, although there may be an alleged difference in dialect, the testimony as presented through the interpreter was

10

understandable, comprehensible, and intelligible. <u>Casipe</u>, 5 Haw. App. at 216, 686 P.2d at 34.[2/]

It appears that Irons did have some difficulty when translating parts of Paulis's testimony. The question, however, is whether Sanes was denied his constitutional rights as a result of a defective translator. <u>Casipe</u>, 5 Haw. App. at 214, 686 P.2d at 32.

Sanes fails to show how the exchanges he cites or the generalized errors he alleges resulted in any prejudice to him. Sanes points to areas of the record in which Irons needed to catch up with Paulis's testimony or clarify a translation. Sanes does not allege any particular instance in which he was materially affected by Irons's need to rephrase a statement or that she misinterpreted words or phrases. Furthermore, Sanes does not demonstrate why Irons's initial translation of the words "confused" and "angry" amounted to an error capable of rebutting the presumption that Irons was a capable interpreter. Irons's error was corrected shortly after it was made. It was an isolated mistake. The Circuit Court reviewed with the parties the transcript of the angry-versus-confused translation and, to the defendant's apparent satisfaction, read that portion of the transcript to the jury. We cannot conclude that Sanes suffered prejudice as a result of this corrected error. Sanes was not denied due process and a fair trial as a result of Irons's interpretation. Accordingly, the Circuit Court did not abuse its discretion in denying Sanes's motion for a mistrial.

---

[2/] We also note that, pursuant to HRE Rule 604, "[a]n interpreter is subject to the provisions of these rules relating to qualification as an expert[.]" Thus, a courtroom interpreter is considered an expert that may be cross-examined as to the trustworthiness or validity of their interpretation. <u>See</u> HRE Rule 702; <u>McCandless v. Waiahole Water Co.</u>, 35 Haw. 314, 320 (1940) (holding that a party has a right to cross-examine a witness offered as a translator to test the qualifications of the witness). Failure to do so may be viewed as an abandonment by the defense. <u>State v. Brooks</u>, 44 Haw. 82, 89, 352 P.2d 611, 616 (1960).

C.    The Newspaper Clipping

Sanes argues that the Circuit Court erroneously excluded from evidence a newspaper clipping found in Refilong's wallet after his death. This clipping purportedly described an incident at the same shopping center as Refilong's homicide where six men were involved in a stabbing. Sanes argues that the newspaper clipping was relevant to his argument that Refilong was the initial aggressor and that Sanes was acting in self defense. Sanes argues that the newspaper clipping would support the inference that Refilong "associates with people who engage in knife fights" and that "a person who would carry around such a clipping is more likely to be someone who would engage in such a knife fight himself."

We disagree. As the trial court concluded, any inference to be drawn from the introduction of the clipping would have been purely speculative. Moreover, the clipping was apparently never recovered, so there is no record of what it said. Indeed, even if the newspaper clipping was marginally relevant, the Circuit Court did not abuse its discretion when it held that the probative value of the clipping was "far outweighed by the risk of the jury misinterpreting it, speculating, accepting speculative arguments based on it."

D.    Ineffective Assistance of Counsel

Sanes argues that he received ineffective assistance of counsel in two instances. First, Sanes argues that his trial counsel did not prepare him to testify using a diagram of the crime scene that was used at trial to illustrate the location where the incident occurred. Sanes argues that this lack of preparation made it appear that "the testimony is scripted and the witness is not following the script[,]" and that, alternatively, counsel questioned the credibility of his own witness by impressing that he believed the first cut occurred in a manner different from what Sanes testified. This claim is

without merit.  It is evident from the transcript that Sanes was merely confused as to the orientation or layout of the diagram. The confusion was relieved when Sanes was shown actual pictures of a planter and newspaper stand and Sanes testified regarding where the knife blows occurred in relation to these items. Sanes's trial counsel did not commit an error or omission reflecting his lack of skill, judgment, or diligence as it relates to the diagram of the crime scene.

Sanes also claims various errors by trial counsel relating to Lean's testimony, arguing:  (1) counsel should have objected to Lean's testimony as more prejudicial than probative; (2)  counsel should have objected to Lean's testimony that he was kept in the hole as a management problem, thereby implying that Sanes was a management problem; (3) counsel should have impeached or moved to strike certain testimony that was inconsistent with Lean's original statement; (4) counsel should have requested a cautionary instruction regarding Lean's credibility; and (5) counsel's cross-examination strategy – attempting to show that Sanes was merely boasting to show that he was a tough guy – was so weak as to be constitutionally infirm.  Upon careful review of the entire record, and consideration of the arguments made in the parties' briefs and at oral argument, we conclude that Sanes did not meet his burden of demonstrating (1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and (2) such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.  See, e.g., State v. Antone, 62 Haw. 346, 348, 615 P.2d 101, 104 (1980) (citations omitted).

E.    Cautionary Instruction

Sanes argues that the Circuit Court erred by failing to give a cautionary instruction regarding Lean's credibility.  This argument is also without merit.  The following instruction was given to the jury regarding the credibility of witnesses:

It is your exclusive right to determine whether and to what extent a witness should be believed and to give weight to his or her testimony accordingly.  In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor; the witness's manner of testifying; the witness's intelligence; the witness's candor or frankness, or lack thereof; the witness's interest, if any, in the result of this case; the witness's relation, if any, to a party; the witness's temper, feeling, or bias, if any has been shown; the witness's means and opportunity of acquiring information; the probability or improbability of the witness's testimony; the extent to which the witness is supported or contradicted by other evidence; the extent to which the witness has made contradictory statements, whether in trial or at other times; and all other circumstances surrounding the witness and bearing upon his or her credibility.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit such testimony.  In weighing the effect of inconsistencies or discrepancies, whether they occur within one witness's testimony or as between different witnesses, consider whether they concern matters of importance or only matters of unimportant detail, and whether they result from innocent error or deliberate falsehood.

The jury was properly instructed to weigh the credibility of witnesses based on factors that, according to Sanes, should cast doubt on Lean's credibility.  The jury was fully apprised of Lean's criminal history, his behavioral problems at OCCC, and the nature and timing of his cooperation agreement, and thus, was able to fully assess his credibility. Accordingly, a more specific cautionary instruction was not necessary.  See, e.g., State v. Jones, 62 Haw. 572, 581-82, 617 P.2d 1214, 1221 (1980) (holding that a jury instruction regarding the credibility of witnesses was sufficient, thus rendering a cautionary instruction unnecessary).

F.    Prosecutorial Misconduct

Sanes's final argument is that the State committed prosecutorial misconduct by eliciting from Lean that he was in the hole at OCCC because Lean was a management problem, thereby attempting to create the false impression that Sanes was in the hole because he too was a management problem.  We consider:  (1) the nature of the conduct; (2) the promptness of a curative

instruction; and (3) the strength or weakness of the evidence against the defendant. See, e.g., State v. Maluia, 107 Hawai'i 20, 24, 108 P.3d 974, 981 (2005).

Here, on direct examination, the prosecutor elicited from Lean that the hole was where they send inmates that are a management problem, that he was in the hole because he took a shower in his cell sink, and that he met Sanes there. This was basically the circumstances of their encounter and did not necessarily reflect badly on Sanes. The prosecution did not elicit testimony that the only reason inmates were placed in the hole was because they were a management problem and did not argue in closing that Sanes had been placed in the hole because he was a management problem. No cautionary instruction was given because none was requested.

Even if the reference to Sanes's being in the hole were to be considered improper, the third and final factor convinces us that any such prosecutorial conduct was harmless beyond a reasonable doubt. The evidence supporting Sanes's manslaughter conviction is overwhelming. Sanes testified that he delivered the first blow to Refilong because he was afraid of getting hurt and that he delivered the second blow in "self-defense" because he was afraid of being left behind by Tainy. In addition, this testimony is directly contradicted by the testimony of the other witnesses, who stated that Sanes simply exited the car and stabbed Refilong in the neck. Sanes also testified that Refilong was unarmed. Finally, Lean testified that Sanes admitted to killing Refilong because Sanes wanted to be like his uncle, and that he did so without remorse. Thus, even if we were to construe the elicitation of the in-the-hole testimony as misconduct, it was harmless beyond a reasonable doubt.

V.    CONCLUSION

For these reasons, we affirm the Circuit Court's March 2, 2009 Judgment of Conviction and Sentence.

DATED:  Honolulu, Hawai'i, October 27, 2010.

Walter R. Schoettle
for Defendant-Appellant

James M. Anderson
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge